UNITED STATES of America, Plaintiff,

v.

Stacey C. KOON, Laurence M. Powell, Timothy E. Wind, and Theodore J. Briseno, Defendants.

No. CR 92 686 JGD.

United States District Court, C.D. California.

Aug. 4, 1993.

Steven D. Clymer, Lawrence Middleton, Asst. U.S. Attys., Los Angeles, CA, Barry F. Kowalski, Deputy Chief, Civ. Rights Div., U.S. Dept. of Justice, Washington, DC, for the U.S.

Ira Salzman, Pasadena, CA, for Stacey C. Koon.

Harland W. Braun, Los Angeles, CA, for Theodore J. Briseno.

Michael P. Stone, Los Angeles, CA, for Laurence M. Powell.

Paul R. DePasquale, Los Angeles, CA, for Timothy E. Wind.

## SENTENCING MEMORANDUM

DAVIES, District Judge.

### INTRODUCTION

Four Los Angeles Police Officers, Stacey C. Koon, Laurence M. Powell, Timothy E. Wind, and Theodore J. Briseno, were indicted by the United States in a Two–Count Indictment filed August 4, 1992. The Indictment charges in Count One that defendants Laurence M. Powell, Timothy E. Wind, and Theodore J. Briseno violated Title 18, United States Code, Section 2, and Title 18, United States Code, Section 242, and aided and abetted each other. The Government charges that while acting under color of the laws of the state of California, said officers willfully struck with batons, kicked, and stomped Rodney Glen King, resulting in bodily injury to him and, thereby, willfully deprived him of the right preserved and protected by the Constitution of the United States not to be deprived of liberty without due process of law, including the right to be secure in his person and free from the intentional use of unreasonable force by one making an arrest under color of law. The aiding and abetting count was stated in Count One of the Indictment, but at trial was treated as a separate count and was submitted to the jury as such.

Count Two of the Indictment alleges violation of Title 18, United States Code, Section 242, and is directed against Stacey C. Koon alone. He is charged with willfully permitting the other officers in his presence, and under his supervision, to unlawfully strike with batons, kick, and stomp Rodney Glen King and with the willful failure to prevent the unlawful assault by said officers, all in violation of the right preserved and protected by the Constitution of the United States not to be deprived of liberty without due process of law, including the right to be kept free from harm while in official custody.

The case was tried to a jury commencing February 25, 1993. The jury reached its verdicts on April 16, 1993, and the verdicts were handed up on April 17, 1993.

By said verdicts the jury found that none of the defendants was guilty of aiding and abetting, that Officer Briseno was not guilty of the charges alleged in Count One and was acquitted, that Officer Wind was not guilty of the charges alleged in Count One and was acquitted, that Officer Powell was guilty of the charges other than aiding and abetting alleged in Count One, and that Sergeant Koon was guilty of the charges alleged in Count Two.

The matter is now before this Court for the sentencing of Laurence M. Powell and Stacey C. Koon. The Court has reviewed, read, and considered the presentence reports, the addenda thereto, the position papers and sentencing memoranda filed by the defendants and by the Government. The Court has reviewed and considered a multitude of letters relating to the trial of the case and sentencing, and letters written in support of the defendants. The Court has also considered the United States Sentencing Commission *Guidelines Manual*, effective November 1, 1992[1], and the arguments of counsel. Based thereon, the Court makes its findings as follows and sentences the defendants as follows.

### FINDINGS OF FACT

The details of the arrest of Rodney Glen King in the early morning hours of March 3, 1991, on Osborne Street near Hanson Dam, Los Angeles, were disclosed at trial. Multiple motions were made before trial in an effort to resolve the many legal problems that emerged, and witnesses testified and evidence was taken between February 25, 1993, and April 6, 1993. The Government presented its case in great detail. It is hard to imagine that the Government overlooked any fact. However, because the verdicts

---

1. Hereinafter "the Guidelines."

were general and no special findings were made by the jury, certain factual conclusions and findings remain undetermined. For the purposes of sentencing it falls to the Court to make those findings [2].

The essential facts proved at trial were as follows:

During the early evening hours of March 2, 1991, Rodney Glen King met with two friends and sat in his wife's Hyundai automobile in Altadena, a suburb of Los Angeles, drinking a malt beer beverage, Old English 800, packaged in 40–ounce bottles. Mr. King consumed at least two bottles. His friends also drank Old English 800. Although it is not clear precisely how much they each consumed, it is certain that Mr. King consumed more than 80 ounces. Mr. King and his friends drank in the parked automobile for a number of hours. Late in the evening, they left Altadena in the Hyundai. Mr. King drove. Their intended destination is not clear. Mr. King testified that it was Hanson Dam, but his friend Bryant Allen testified that the three companions left Altadena to "look for women."

Mr. King was intoxicated. He drove the Hyundai from Altadena to the 210 Freeway, then west from Pasadena towards the city of San Fernando. While westbound, in the vicinity of La Tuna Canyon Road, CHP Officer Melanie Singer and Officer Tim Singer, her husband and training officer, observed the Hyundai speeding westbound on the freeway behind the CHP cruiser. Officer Melanie Singer was driving. The CHP vehicle exited and re-entered the freeway at Sunland Boulevard, and with red lights and siren activated followed the Hyundai, which was by then about one mile west of the CHP vehicle. Officer Melanie Singer estimated the speed of the Hyundai west of Wheatland Avenue as being in excess of 100 m.p.h.

Mr. King left the freeway at Paxton Avenue and commenced traveling on surface streets, followed by the Singers' CHP unit.

Officer Melanie Singer called for back up. The CHP dispatcher alerted LAPD by radio call. The call was heard by patrol officers of the Los Angeles Unified School District in a unit nearby which joined the chase. In addition, Officers Powell and Wind in an LAPD unit responded to the call. During the pursuit, the CHP officers attempted to communicate with Mr. King as he drove on the surface streets, and ordered him to pull over. He failed to do so. Mr. King testified that he did not pull over because he was afraid of returning to prison.

Mr. King continued on the route chosen by him, at times stopping for red lights, at times proceeding through red lights. The CHP vehicle and the school district vehicle followed the Hyundai at varying speeds. They were joined by Officer Powell and Wind's vehicle. After the Hyundai left the freeway, the pursuit was always at moderate to slow speeds. The three police vehicles followed the Hyundai for a number of miles on surface streets to the point where it stopped at an entrance to the Hanson Dam recreation area on Osborne Street. In all, the CHP unit followed the Hyundai for approximately eight miles before the pursuit ended.

The CHP vehicle, the School District vehicle, and Officer Powell's vehicle came to rest in the immediate vicinity of the Hyundai. The occupants of the Hyundai were ordered out of the vehicle by Officer Singer. The two passengers exited the Hyundai and followed instructions of the police officers. Mr. King was slow to move from the driver's seat but ultimately did and was repeatedly ordered to lie on the ground. He emerged from the Hyundai smiling. This was the scene when Sergeant Koon arrived. Officers Briseno and Rolando Solano arrived in their unit moments after Sergeant Koon.

Mr. King did what appeared to be a dance step, and then waved at an LAPD helicopter overhead. Officer Melanie Singer ordered

**2.** The government argues in its Consolidated Positions and Objections With Respect to Sentencing Factors that there are factual errors in the pre-sentence reports and the Court should make findings pursuant to Federal Rule of Criminal Procedure 32(c)(3)(D), or declare that the facts in dispute are not relied upon by the Court for sentencing. To the extent the disputed facts are consistent with the Court's recitation of the facts herein, the Court finds those to be the facts for sentencing purposes. To the extent there is inconsistency, the Court declares it has not relied upon the inconsistent facts set forth in the pre-sentence reports.

Mr. King to move away from the Hyundai and to place his hands where she could see them, and then again ordered him to the ground. When she did so, he grabbed his buttocks. Officer Singer pointed her service revolver at him. Mr. King did not lie prone but moved around on his hands and knees.

Sergeant Koon took command and ordered Officer Melanie Singer to holster her service revolver. The LAPD officers then commenced the arrest process. Mr. King was a large muscular man and a felony suspect. Sergeant Koon testified that he thought Mr. King may have been recently imprisoned because Mr. King appeared to have engaged in the bodybuilding common among prison inmates. The officers ordered Mr. King to lie in the felony-prone position. He refused to do so. Officers Powell, Wind, Briseno, and Solano jointly attempted to place Mr. King in a felony-prone position. He resisted and became combative, forcing the officers to retreat. The subsequent events were captured by Mr. George Holliday on videotape, Exhibit 20 at trial.

The tape does not capture the entire sequence. It records the events commencing with a view of Mr. King on the ground, surrounded by officers. The Holliday videotape became the focus of a good deal of testimony at trial and was analyzed in thorough detail by expert and other witnesses called by each side. The Court has reviewed the tape for the purpose of sentencing. Although the videotape creates a vivid impression of a violent encounter, careful analysis shows that it is sometimes an ambiguous record of the crucial events. A meaningful understanding of the events it depicts required the explanation of witnesses who are experts in law enforcement. At trial the Government and defendants agreed that much of the officers' conduct was justified and legal, yet vigorously disputed whether and when their behavior became illegal.

The principal question for sentencing not answered by the verdicts is, when did the offenses committed by Officer Powell and by Sergeant Koon occur? The answer to this question determines the extent to which these defendants are liable for Mr. King's injuries. Injury is an element of the offenses with which Officer Powell and Sergeant Koon were charged, and is relevant to the determination of their sentences under the Sentencing Guidelines.

■ Answering this question requires a two-tiered inquiry. The offenses the jury found to have been committed occurred when Officer Powell used excessive force and formed the intent to deprive Mr. King of his civil rights, and when Sergeant Koon intended to refrain from preventing the officers under his control from using excessive force which deprived Mr. King of his constitutional rights. Sergeant Koon's criminal liability is not derivative from Officer Powell's liability. *See United States v. Reese*, 2 F.3d 870, 889–90 (9th Cir. July 28, 1993). Sergeant Koon's conviction rests entirely upon the wrongfulness of his own conduct, that is, his willful refusal to prevent illegal use of force in his presence. *Id.* Thus, the Court must make separate determinations concerning Officer Powell's and Sergeant Koon's illegal behavior.

### (1) *Officer Powell*

The videotape displays a continuum of events involving behavior that was initially legal and which became criminal. The initial task for the Court, for the purposes of sentencing, is to determine when Officer Powell's behavior became illegal. Did it become illegal only once and then continue to be illegal for a period of time, or was it at times legal and at times illegal? The Court finds that Officer Powell crossed the line between legal behavior and illegal behavior once. This is demonstrated in Exhibit 20 [3].

■ Although the videotape is reliable evidence of the physical events that unfolded in the course of Mr. King's arrest, it provides less direct evidence concerning two factors central to Officer Powell's illegal behavior. To determine that at any given point Officer Powell's behavior crossed the line into illegal-

---

**3.** Exhibit 20 is time calibrated. References are to the calibrations which appear in terms of minutes, seconds, and frames.

ity, the Court must find that Officer Powell used objectively unreasonable force, and that he intended to use excessive force. The standard for objectively unreasonable force is supplied by the Supreme Court in *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989), which held that "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." The *Graham* Court cautioned that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.*

■ Accordingly, in evaluating the videotape, the Court must take into account the totality of the circumstances, including facts not displayed on the tape. Mr. King had not been searched. Mr. King did not respond to the electrical charge of Sergeant Koon's taser. Sergeant Koon testified that he observed Mr. King sweating profusely. At least during the initial stages of the arrest process, Sergeant Koon may reasonably have suspected that Mr. King was under the influence of PCP because of Mr. King's erratic and recalcitrant behavior.

The initial image on the Holliday videotape is of Mr. King on the ground surrounded by officers. For a brief period, he appears to have been motionless. Mr. King testified that during that moment he decided to try to escape through a gap between the Hyundai and a police vehicle into the Hanson Dam recreation area. He then rapidly rose to his hands and knees, and to his feet. He turned, outstretched his arms forward, and charged towards Officer Powell. Officer Powell took a step and struck Mr. King on the right side of his face and head with the side-handle baton. Mr. King fell to the ground. As Mr. King continued to attempt to rise, he was struck by Officer Powell and then by Officer Wind.

Officer Powell struck Mr. King repeatedly on the lower extremities from the 35th second of the tape to the 51st second of the tape. Officer Powell also delivered a blow to Mr. King's upper torso. Mr. King moved throughout this period, posing an apparent threat. He was ordered to assume the felony-prone position, but failed to respond to these commands. At 55 seconds into the tape, Officer Powell struck Mr. King on the chest or upper abdomen. He rolled over from a position with his abdomen on the ground to a position on his back. Mr. King's right hand moved in a downward direction across his chest and abdomen. Officer Powell struck Mr. King's chest or upper abdomen while Mr. King's hand was moving. After this blow, which may be seen at frame 55:08 on Exhibit 20, the application of force was suspended. The officers observed Mr. King roll over once more onto his abdomen. They watched him for 10 seconds.

In frames 1:03 and 1:04, Officer Powell reached for and briefly handled his cuffs, which were dangling from his right, back trousers pocket. This movement is evidence that Officer Powell perceived Mr. King to be no longer a threat and ready for cuffing.

At 1:05:20, Officer Briseno used his left foot to kick or stomp Mr. King in the upper thoracic area. Mr. King's body writhed in response. His feet rose, his head rose, and he raised his upper torso on his elbows. These movements by Mr. King were reflexive and nonvoluntary. He posed no threat.

Officer Powell struck Mr. King with his baton at 1:07:28 and thereafter struck him another 5 or 6 times [4]. Officer Wind struck Mr. King 4 times with his baton, and kicked him in the upper thoracic or cervical area six times. Mr. King suffered this series of blows until approximately 1:26. At 1:30:13, Officer Powell handed his cuffs to Officer Briseno, and officers surrounded Mr. King. Mr. King was cuffed at 1:42. The procedure continued to 2:05, by which time Mr. King was tied.

As explained below, the Court finds that Officer Powell's offense conduct commenced when he struck King at 1:07:28 on Exhibit 20, and continued to 1:26:00. He crossed the line between legal and illegal behavior at this time. No force used by Officer Powell prior

4. Because of the quality of the tape, a precise count is not possible.

to the blow memorialized on the videotape at 1:07:28 rose to the level of criminal deprivation of Mr. King's rights. Some of it was beyond the standards and practice of the LAPD. However, none of this conduct constitutes a violation of 18 U.S.C. § 242.

To determine the extent to which Mr. King's injuries resulted from Officer Powell's illegal behavior, it is necessary to determine when they occurred and whether they were the product of illegal force. These injuries fall into three broad categories: (1) fractures of facial bones and lacerations to the right forehead and facial area, (2) fracture of the distal fibula in the right leg, and (3) body bruises, contusions, and abrasions. The Court's inquiry is whether any of these injuries occurred prior to 1:07:28.

■ *The Facial Fractures and Forehead Laceration.* The most contested issue at trial relating to injuries was whether Mr. King's facial fractures and forehead laceration were the result of a baton blow, or blows, by Officer Powell, or the result of his face coming into contact with the ground surface. The Court finds that these facial injuries were caused by Officer Powell and that they occurred in the earliest sequence on the videotape when Mr. King, attempting to escape, charged toward Officer Powell.

Although the videotape is out of focus and the camera is moving too rapidly to record the events with unequivocal clarity, the videotape and other evidence demonstrates that Mr. King rose rapidly to his feet, turned, extended his arms and ran towards Officer Powell, who stepped into Mr. King's path and struck Mr. King with the side-handle baton on the right side of the face and skull. The baton is demonstrated in the tape at this point as being in Officer Powell's hands, vertical, and parallel to Mr. King's upright body.

At trial the government presented evidence that this blow to the head was outside LAPD use-of-force policy guidelines if Officer Powell intended to strike Mr. King's head. However, the Court cannot find that this blow was objectively unreasonable in the totality of circumstances or that Officer Powell acted with an illegal intent. In view of Mr. King's sudden approach and Officer Powell's legitimate interest in stopping the hard-charging Mr. King, Officer Powell may have directed a blow at Mr. King that inadvertently struck his head. Telling evidence that the head blow was unintentional is provided by the fact that Officer Powell never clearly applied force to Mr. King's head again, although he had ample opportunity to do so. Accordingly, Officer Powell is not criminally liable for Mr. King's head and facial injuries.

■ *The Leg Fracture.* Mr. King sustained a fracture of the fibula in the right leg. This fracture was in the lower portion of the leg, and the Government argues that it was the result of a blow administered by Officer Powell at approximately 43 seconds into the videotape. The Court agrees it is clear that at that point Officer Powell struck Mr. King with the baton in the area of the right ankle, and that this blow caused Mr. King's fracture.

However, blows to leg joints are within the policy guidelines of the Los Angeles Police Department if necessary to forestall a threat. Preceding the relevant moments the situation had evolved rapidly. Mr. King had tried to rise, and as Officer Powell delivered the blows to the legs, Mr. King continued to move and resist repeated attempts to place him into the felony-prone position. It is unclear that a reasonable officer at the scene would not have delivered at least some of these blows. Moreover, in view of the rapidly shifting nature of the situation, the Court cannot find that Officer Powell intended to use excessive force. Accordingly, although Officer Powell's blow may have been tortious, he is not criminally liable for the fracture of the fibula.

■ *Body Bruises and Contusions.* As described *supra*, at 55 seconds into the tape, Officer Powell struck Mr. King on the chest or upper abdomen as Mr. King's body moved and Mr. King's right hand reached downward across his chest in the direction of the waistline of his pants. At trial Sergeant Mark Conta testified that this was a flagrant violation of the LAPD's use-of-force policy guidelines. However, Mr. King had not been searched, and a reasonable officer at the scene may have judged that Mr. King was reaching for a weapon. Moreover, it is un-

likely that Officer Powell intended to use excessive force. The situation forced him to react swiftly to Mr. King's hand movement, and it was not unreasonable for Officer Powell to block the hand movement with his baton. Under the circumstances this blow was not objectively unreasonable. The chest blow did not produce chargeable injury under 18 U.S.C. § 242.

Officer Powell's conduct clearly crossed the line into illegality at 1:07:28 when he struck Mr. King despite his perception that Mr. King was no longer a threat. Officer Powell is liable for the bodily injury he inflicted. He is not liable for bodily injury inflicted by Officer Wind during this period. The precise injuries caused by Powell were not demonstrated at trial. Mr. King undoubtedly sustained contusions as a result of the six blows by Powell. But the nature and extent thereof are unknown. It is impossible to distinguish between the injury inflicted by Wind and that inflicted by Powell. However, the injuries for which Powell is liable are limited to contusions, perhaps abrasions, but no fractures. For the reasons cited above, the Court finds that Officer Powell's behavior did not violate 18 U.S.C. § 242 prior to this moment. Thus, Officer Powell is not criminally liable for injuries sustained before this moment.

*(2) Sergeant Koon*

The remaining task is to determine when Sergeant Koon's behavior became criminal. The Ninth Circuit has stated that "a police sergeant who stands by and watches while officers under his command use excessive force and refuses to order them to stop may thereby 'subject' the victim to the loss of his or her right to be kept free from harm while in official custody or detention." *See Reese,* 2 F.3d at 889. The police sergeant must recognize that the force is excessive and that there are reasonable steps within his power that he could take to prevent the use of force. *Id.* at 890. Finally, the police sergeant must deliberately or willfully refrain from preventing the excessive force. *Id.*

The court in *Reese* does not squarely address whether the unlawfully excessive force must stem from criminal conduct by officers

under the police sergeant's control. Nonetheless, the court's reasoning in *Reese,* as well as authority from other circuits, implies that a police sergeant is liable for permitting harm from excessive force, even when the supervised officers' conduct does not rise to the level of criminal activity, provided that the conduct is a constitutional tort. *See id.* at 889–90; *O'Neill v. Krzeminski,* 839 F.2d 9, 11–12 (2d Cir.1988). Accordingly, to determine the extent of Sergeant Koon's criminal liability, it is necessary to assess whether he failed to prevent tortious or criminal excessive force applied by Officers Powell, Wind, and Briseno.

Three facts simplify this inquiry. First, Officer Briseno's use of force against Mr. King was limited to a single stomp or kick at 1:05.20. Because Sergeant Koon could not have anticipated Officer Briseno's sudden movement, he is not criminally liable for failing to prevent this kick or stomp.

Second, prior to 1:07.28, Officer Wind delivered several blows to Mr. King in response to Mr. King's attempt to flee and his repeated efforts to rise from the ground. Because Mr. King posed a continuing threat, the Court cannot find that a reasonable officer would not have delivered these blows, or that Sergeant Koon had the requisite criminal intent in permitting them.

Third, the Court has found that prior to 1:07.28, Officer Powell's conduct did not violate 18 U.S.C. § 242.

For these reasons, the Court's inquiry concerning Sergeant Koon is limited to Officer Powell's potentially tortious use of force prior to 1:07.28, and Officers Powell and Wind's use of force after 1:07.28.

■ *The Facial Injuries.* Because the Court has found that these injuries were caused by Officer Powell's lawful application of force, Sergeant Koon is not criminally liable for permitting the blow or blows that caused these injuries.

■ *The Leg Fracture.* For the reasons discussed *supra,* the Court has found that Officer Powell lacked the requisite criminal intent to use excessive force when he delivered the blow that caused Mr. King's leg

fracture. The same reasons compel the Court to find that Sergeant Koon lacked the requisite criminal intent to permit the use of excessive force. Preceding Officer Powell's blows Mr. King had tried to rise, and he continued to resist being placed in the felony-prone position as Officer Powell delivered the blows. Once before, Sergeant Koon had witnessed Mr. King successfully resist officers, rise up while prone, and charge, intending to escape, in the direction of Officer Powell. Accordingly, Sergeant Koon is not criminally liable for permitting the blow that caused Mr. King's leg fracture.

■ *Body Bruises and Contusions.* Because Officer Powell's blow to Mr. King's chest or upper abdomen was a sudden response to Mr. King's hand movement, Sergeant Koon had no reasonable opportunity to anticipate or prevent it, and cannot be charged with injuries stemming from it.

By contrast, Sergeant Koon is liable for permitting Officers Powell and Wind's conduct after 1:07.28. At this point, Officer Powell's conduct crossed the line into criminal illegality. Moreover, because Mr. King posed no threat, Officer Wind's baton blows and leg kicks were objectively unreasonable. Sergeant Koon could have seen that Mr. King's movements in response to Officer Briseno's kick or stomp were involuntary, and he had a reasonable opportunity to halt Officers Powell and Wind's use of force. Sergeant Koon is liable for his failure to order the cuffing of Mr. King during the 10 seconds immediately prior to the kick by Officer Briseno, and for permitting the application of force by Officers Powell and Wind thereafter. Accordingly, bruises and contusions incurred during this period are chargeable to Sergeant Koon.

### (3) Summary

Neither Officer Powell nor Sergeant Koon is liable for Mr. King's serious bodily injuries, namely, his facial injuries and leg frac-ture. Both officers are liable to differing degrees for Mr. King's bruises and abrasions sustained after 1:07:28. Because neither officer violated 18 U.S.C. § 242 prior to this moment, neither is liable for injuries sustained by Mr. King before the event recorded at 1:07.28 of the videotape, and the Court so finds.

## DISCUSSION

### A. Calculation of Offense Level Under the Sentencing Guidelines

Both defendants Stacey C. Koon and Laurence M. Powell were convicted of violations of 18 U.S.C. § 242. Section 2H1.4 of the Guidelines addresses the calculation of a base offense level for this offense. *See* Guidelines § 1B1.2 (applicable Chapter Two guideline determined by the offense of conviction); Guidelines Appendix A.

Pursuant to Guidelines Section 2H1.4, the appropriate base offense level for a violation of 18 U.S.C. § 242 is the greater of (1) 10; or (2) 6 plus the offense level applicable to the underlying offense [5].

■ Where the Guidelines specify more than one base level offense, the Court's determination of which to apply is to be based on the defendant's "relevant conduct," as defined in Section 1B1.3 of the Guidelines. "Relevant conduct" includes:

> all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant. . . .

*See* Guidelines § 1B1.3(a)(1)(A).

For purposes of calculating Mr. Powell's base offense level, the Court considers his relevant conduct to be the blows he administered after 1:07:28. Mr. Koon, on the other hand, was convicted of an offense of omission, and is liable for failing to stop Powell's and Wind's excessive use of force when he

---

5. Application Note 1 to Guideline Section 2H1.4 provides that "6 plus the offense level applicable to any underlying offense" means 6 levels above the offense level for any underlying criminal conduct. Application Note 1 to Section 2H1.4 refers the Court to the Commentary of another Guidelines section, Section 2H1.1. According to Ap-plication Note 1 to Section 2H1.1, the "underlying offense" includes "any offense under federal state, or local law other than an offense that is itself covered under Chapter Two, Part H, Subpart 1, 2, or 4." *See* Guidelines § 2H1.1, Commentary, Application Note 1.

could have and should have. The excessive force used by Powell and Wind with Koon's permission constitutes "relevant conduct" for purposes of calculating Koon's base offense level.[6]

To calculate the defendants' base offense level under Section 2H1.4, the Court must first determine the appropriate underlying offense and its corresponding offense level. The sum of the corresponding offense level and 6 represents the proper base level offense, if it exceeds 10. *See* Guideline § 2H1.4, Commentary, Application Note 1.

Based on the defendants' "relevant conduct," the appropriate underlying offense for each is assault. The corresponding offense level, however, depends on whether Powell committed and Koon permitted an aggravated or a minor assault.

### 1. *Aggravated vs. Minor Assault*

The government takes the position that the underlying criminal conduct constitutes an aggravated assault, such that the offense levels set forth in Section 2A2.2 apply to both Koon and Powell. The Court agrees.

An aggravated assault, within the meaning of the Guidelines, is a "felonious assault that involved (a) a dangerous weapon with intent to do bodily harm (*i.e.*, not merely to frighten), or (b) serious bodily injury, or (c) an intent to commit the felony"[7]. *See* Guidelines § 2A2.2, Commentary, Application Note 1.

In this case, the assault committed by Powell and permitted by Koon is a felony. Pursuant to 18 U.S.C. § 3559, an offense is a Class C felony if the maximum term of imprisonment authorized is at least ten years,

but less than twenty years. Ten years is the maximum term of imprisonment authorized for a violation of 18 U.S.C. § 242 when bodily injury results.[8]

Additionally, the felonious assault in this case involved a dangerous weapon. The term "dangerous weapon," as used in the Guidelines, means an "instrument capable of inflicting death or serious bodily injury." *See* Guidelines § 1B1.1, Commentary, Application Note 1(d). Where an object that appears to be a dangerous weapon is "brandished, displayed, or possessed, the object is to be treated as a dangerous weapon for purposes of sentencing." *Id.* The side-handle baton which Powell used and Koon permitted to be used against Mr. King is certainly capable of inflicting death or serious bodily injury. On this point, there is consensus among the government, the Probation Officer, the applicable case law, and Mr. Powell's own expert witness. *See* Government's Sentencing Memorandum; Presentence Report, para. 70; *United States v. Park*, 988 F.2d 107, 109–10 (11th Cir.1993) (metal pipe raised in a threatening manner considered "dangerous weapon" for purposes of aggravated assault Guideline), *petition for cert. filed*, July 13, 1993; R.T., 3/31/93, at 20–23 (testimony of defense biomechanics expert, Dr. Carly Ward, that the side-handle baton can deliver sufficient force to cause loss of consciousness and significant localized damage of facial bones).

Further, the evidence presented at trial and the verdicts clearly demonstrate that defendant Powell used the side-handle baton, and defendant Koon permitted its use, with the intent to harm Mr. King. Guidelines Section 2A2.2 distinguishes a situation

---

**6.** The Court recognizes the critical distinction between Koon's offense conduct and the unlawful conduct committed by Powell. *See Reese*, 93 Daily Journal D.A.R. at 9626.

**7.** The Application Notes to Section 2H1.1 offer the following example of a case in which the underlying offense is aggravated assault:
in the case of a conspiracy to interfere with a person's civil rights (a violation of 18 U.S.C. § 241) that involved an aggravated assault (the use of force) to deny certain rights or benefits in furtherance of discrimination (a violation of 18 U.S.C. § 245), the underlying offense in

respect to both the violation of 18 U.S.C. § 241 (to which § 2H1.1 applies) and the violation of 18 U.S.C. § 245 (to which § 2H1.3 applies) would be the aggravated assault.
*See* Guidelines § 2H1.1, Commentary, Application Note 1; *see also* Guidelines § 2H1.4, Commentary, Application Note 1 (referring to discussion of "underlying offense" in § 2H1.1).

**8.** In this particular case, the Court instructed the jury that a finding of bodily injury was necessary for conviction. *See* Reporter's Transcript of Proceedings (hereinafter "R.T."), 4/10/93, at 13.

in which a deadly weapon is used "with intent to do bodily harm," from one in which it is used "merely to frighten." *See* Guidelines § 2A2.2, Commentary, Application Note 1. By itself, Powell's repeated use of the metal side-handle baton to strike Mr. King while King was no longer a threat is evidence that Powell intended to inflict bodily harm on Mr. King. *See Park,* 988 F.2d 107, 109–10 (defendant intended to do bodily harm, and was properly sentenced under aggravated assault guideline, where he swung a metal pipe in the direction of IRS agents, and threatened to "bash their heads" unless they complied with his demands); *See also United States v. Bassil,* 932 F.2d 342, 345 (4th Cir.1991) (defendant who threw chair toward correctional officers was properly sentenced under aggravated assault guideline). Additionally, as defendant Koon testified at trial, he intended Powell to use the baton as an impact weapon to gain pain compliance, and then to "cripple" King and "break [King's] bones." *See* R.T., 3/25/93, at 11 & 54; R.T., 3/24/93, at 19 & 28. Based on this testimony and the evidence of Powell's conduct, the Court is persuaded that Powell used the baton, and Koon permitted its use, with the intent to harm Mr. King, not merely to frighten him.

Because the relevant conduct attributable to both defendants Koon and Powell constitutes a felonious assault involving a dangerous weapon with intent to do bodily harm, the appropriate underlying offense is aggravated assault. Pursuant to Guidelines Section 2A2.2, the base offense level for aggravated assault is 15.

### 2. *Specific Offense Characteristics Under Aggravated Assault Guideline*

■ As set forth in Section 2A2.2, certain specific offense characteristics mandate increases in the aggravated assault base level of 15. *See* Guidelines § 2A2.2(b)(1)–(3). If a dangerous weapon, including a firearm, was "otherwise used," the offense level is increased by 4 levels. *See* Guidelines § 2A2.2(b)(2)(B). If the victim sustained bodily injury, the offense level is increased from 2 to 6 levels, based on the seriousness of the injury. *See* Guidelines § 2A2.2(b)(3). The cumulative adjustments for specific offense characteristics may not exceed 9 levels. *Id.*

In this case, a dangerous weapon, the side-handle baton, was "otherwise used." As discussed above, the side-handle baton constitutes a dangerous weapon within the meaning of the Guidelines. *See* supra; Guidelines § 1B1.1, Commentary, Application Note 1(d).

■ Although the Guidelines do not specifically define the term "otherwise used," its meaning may be inferred from the context in which it is used. Guidelines Section 2A2.2(b)(2), which catalogues the specific offense characteristics for use of a firearm or other weapon during an aggravated assault, provides:

(A) If a firearm was discharged, increase by 5 levels; (B) if a dangerous weapon (including a firearm) was otherwise used, increase by 4 levels; (C) if a dangerous weapon (including a firearm) was brandished or its use was threatened, increase by 3 levels.

*See* Guidelines § 2A2.2(b)(2)(A)–(C). Thus, a dangerous weapon is "otherwise used" where it is used in some manner other than by brandishing it, threatening its use, or discharging a firearm. Here, defendant Powell actually used his side-handle baton to strike Mr. King; he did not merely brandish it or threaten to use it. Because Powell's side-handle baton was "otherwise used," and because Koon permitted such use, the aggravated assault base offense is increased by 4 levels for both defendants Koon and Powell [9]. *See* Guidelines § 2A2.2(b)(2)(B).

**9.** Mr. Powell's use of a dangerous weapon was also considered in determining that the Guideline for aggravated assault, rather than minor assault, applies. Nonetheless, the Court must again consider it as a factor for upward adjustment. *See Reese,* 2 F.3d at 894–95 (district court properly applied upward adjustments for use of dangerous weapon and bodily injury, notwithstanding that said factors had already been considered in determining applicability of aggravated assault guideline); *United States v. Williams,* 954 F.2d 204, 206–07 (4th Cir.1992) (reversing district court for refusal to apply upward adjustment under aggravated assault guideline based on "double counting" argument). The Ninth Circuit and other courts have rejected the argument that such calculations constitute improper "double counting." *Reese,* 2 F.3d at 894–95; *see*

█ The aggravated assault base offense is increased further if Mr. King sustained bodily injury as a result of the aggravated assault. The extent of the increase depends on the severity of the injuries sustained. The Guidelines indicate a 2–level increase for "bodily injury," defined to mean "any significant injury; e.g., an injury that is painful or obvious, or is of a type for which medical attention ordinarily would be sought." See Guidelines § 1B1.1, Commentary, Application Note 1(b). A 4–level increase is indicated for "serious bodily injury," defined as "injury involving extreme physical pain or the impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." Id., Application Note 1(j).

It is certain that Mr. King sustained extensive and "serious" bodily injury at some point during the course of the March 3, 1991 use of force. Substantial evidence was presented at trial that Mr. King suffered numerous facial fractures, contusions and lacerations, and a fracture of the fibula in his right leg. Mr. King's injuries required medical intervention, including numerous sutures to close lacerations of his face and scalp, reconstructive surgery to repair his facial fractures, and a cast to set his fractured leg.

However, in reviewing the continuum of events that were initially legal and later became criminal, the Court has found Mr. Powell's use of force to be lawful until 1:07:28, after Briseno's kick. Mr. Koon's conduct was also lawful until 1:07:28. For purposes of sentencing, the Court considers only those injuries sustained by Mr. King after Koon and Powell crossed the line between legal and illegal conduct at 1:07:28. Because the Court finds that Mr. King's head injuries and facial fractures, as well as the fibula fracture, occurred prior to Briseno's kick at 1:05:20, these serious bodily injuries do not warrant an upward adjustment to the aggravated assault offense level.

In addition to the facial fractures, head injuries, fibula fracture, and some contusions, all of which were lawfully inflicted, Mr. King sustained contusions on his arms, legs, chest, shoulders, and back. It is hard to imagine that the six or more illegal baton blows delivered by Powell between 1 minute 7 and 1 minute 26 on the tape did not cause some of these contusions [10]. The points at which Powell's illegal blows contacted Mr. King's body, insofar as those points can be determined from the evidence, include the arms, shoulders and back, corresponding to the locations of the contusions. Mr. King's contusions were obvious, as established by the testimonial and photographic evidence at trial. Common experience proves that such extensive bruising is painful and may warrant medical attention. In sum, Mr. King sustained some bodily injury, as that term is used in the Guidelines, as a result of unlawful baton blows inflicted by defendant Powell and permitted by defendant Koon.

Because the Court finds that Mr. King's "serious" bodily injuries were attributable to a lawful use of force, whereas certain bodily injuries of a lesser degree were attributable to Koon's and Powell's unlawful conduct, the Guidelines indicate a 2–level increase in the aggravated assault offense level, rather than the 4–level increase suggested by the government.

The base offense level for aggravated assault is 15 pursuant to Guidelines Section 2A2.2(a). With a 4–level increase for use of a dangerous weapon, the offense level is 19. See Guidelines § 2A2.2(b)(2)(B). Because Mr. King sustained bodily injury as a result of Koon's and Powell's illegal conduct, an additional 2–level increase is required. See Guidelines § 2A2.2(b)(3)(A). Thus, the offense level applicable to the underlying aggravated assault offense is 21. When the

---

also United States v. Newman, 982 F.2d 665, 672–75 (1st Cir.1992) (aggravated assault base offense level properly increased for infliction of serious bodily injury, notwithstanding that serious bodily injury was initially considered to determine applicability of aggravated assault guideline), petition for cert. filed, April 22, 1993.

10. The kicks and blows delivered by Officer Wind after 1:07:28 may have caused some contusions as well. Mr. Koon permitted and is responsible for these injuries. However, for purposes of determining Koon's offense level, the bodily injury inflicted by Mr. Powell is sufficient to warrant a 2–level increase.

aggravated assault offense level of 21 is added to 6, as required under Section 2H1.4(a)(2), the sum is 27. Since 27 is greater than the base offense level of 10 prescribed at Section 2H1.4(a), the final Chapter Two base offense level is 27. *See* Guidelines § 2H1.4(a).

## B. *Adjustments to the Offense Level*

Chapter Three of the Guidelines provides for certain adjustments to the Chapter Two offense level based on the victim's characteristics and the defendant's role in the offense, obstruction of justice, and acceptance of responsibility. None of the Chapter Three adjustments are applicable here.

 Mr. King was neither unusually vulnerable nor a government official. *See* Guidelines §§ 3A1.1–3A1.2. Mr. King was not physically restrained during the course of the offense. *See* Guidelines § 3A1.3. Therefore, none of the victim-related adjustments apply.

 Nor does Mr. Koon's role in the offense warrant an adjustment of the offense level. Mr. Koon did not have an aggravating or mitigating role as defined in the Guidelines. *See* Guidelines §§ 3B1.1–3B1.2. Guidelines Section 3B1.3 requires an upward adjustment where a defendant abuses a position of public trust; however, this enhancement does not apply to civil rights violations under Section 2H1.4, since the base offense level reflects the abuse of authority inherent in the offense. *See* Guidelines § 2H1.4, Commentary, Background.

Pursuant to Guidelines Section 3C1.1, a 2–level increase applies where a defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense." The Commentary to Section 3C1.1 is explicit that the enhancement applies where a defendant commits perjury. *See* Guidelines § 3C1.1, Commentary, Application Note 3(b).

Mr. Koon testified at trial and denied having acted with the unlawful intent to refrain from protecting Mr. King from an unreasonable use of force. The government contends that the enhancement for obstruction of justice applies here, reasoning that the jury's verdict against Koon necessarily constitutes a finding that Koon testified falsely. The Court disagrees.

 A witness testifying under oath commits perjury if he "gives false testimony concerning a material matter with the willful intent to provide false testimony." *See United States v. Dunnigan*, —— U.S. ——, ——, 113 S.Ct. 1111, 1116, 122 L.Ed.2d 445 (1993). A defendant who chooses to testify at trial and makes false statements in his own defense may be subject to an enhancement for obstruction of justice. *See United States v. Barbosa*, 906 F.2d 1366, 1369–70 (9th Cir.), *cert. denied*, 498 U.S. 961, 111 S.Ct. 394, 112 L.Ed.2d 403 (1990). However, not every accused who testifies at trial and is convicted will incur an enhanced sentence under Section 3C1.1 for committing perjury. *Dunnigan*, —— U.S. at ——, 113 S.Ct. at 1117. An accused may give inaccurate testimony due to confusion, mistake, or memory loss. *Id.* In determining whether to apply Section 3C1.1 to alleged false testimony or statements by a defendant, the testimony or statements are to be "evaluated in a light most favorable to the defendant." *See* Guidelines Section 3C1.1, Commentary, Application Note 1.

 Although Mr. Koon's belief that he acted lawfully is mistaken, as indicated by the jury's verdict, the Court finds that Koon's testimony reflects a personal belief which, at the time of trial, he held in earnest. Mr. Koon did not wilfully intend to provide false testimony. That the jury chose to disbelieve Koon's testimony, or found it insufficient to prove lack of intent, does not establish that Koon committed perjury. *Dunnigan*, —— U.S. at ——, 113 S.Ct. at 1117. An enhancement for obstruction of justice is inappropriate [11].

---

**11.** As an alternative or supplementary basis for an obstruction of justice enhancement, the government suggests that Mr. Koon provided false information to the Probation Officer, by offering his book, *Presumed Guilty*, as an accurate version of the underlying facts. The Court is not persuaded by this argument, as Mr. Koon's book

Since Mr. Koon and Mr. Powell were each convicted of a single count, the Chapter Three adjustments for multiple-count indictments are inapplicable. *See* Guidelines §§ 3D1.1–3D1.5.

 Finally, neither Mr. Koon not Mr. Powell is entitled to a downward adjustment for acceptance of responsibility under Section 3E1.1, since both defendants pled not guilty, put the government to its burden of proof at trial, and were convicted by a jury. *See* Guidelines Section 3E1.1, Commentary, Application Note 2.

### C. *Applicable Guideline Range*

The offense level calculations for both defendants Koon and Powell are summarized as follows:

| | |
|---|---|
| Aggravated Assault Base Offense Level (§ 2A2.2): | + 15 |
| Dangerous weapon "otherwise used" (§ 2A2.2(b)(2)(B)): | + 4 |
| Bodily injury (§ 2A2.2(b)(3)(A)): | + 2 |
| Violation of 18 U.S.C. § 242 (§ 2H1.4(a)(2)): | + 6 |
| TOTAL OFFENSE LEVEL: | 27 |

Neither Koon nor Powell has a criminal record, *see* Koon Presentence Report, para. 94; Powell Presentence Report, para. 74. Both defendants fall within Criminal History Category I. *See* Guidelines, Ch. 5, Pt. A.

Under the Guidelines Sentencing Table, an offense level of 27 with Criminal History Category I results in a prescribed range of 70 to 87 months.

### D. *Downward Departure*

 The Court must impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth at 18 U.S.C. § 3553(a)(2). Ordinarily, it must select a sentence from within the Guideline range. However, the Sentencing Commission expressly recognized the inherent difficulties in prescribing "a single set of·guidelines that encompasses the vast range of human conduct relevant to a sentencing deci-

merely records his perceptions about the inci-

sion." *See* Guidelines, Ch. 1, Pt. A, § 4(b). Thus, the Guidelines are intended to carve out a "heartland" of typical cases. *Id.* When presented with an atypical case, to which a particular Guideline linguistically applies, but where the underlying conduct significantly differs from the norm, the Court may consider whether a departure is warranted. *Id.*

 Departure from the Guidelines and sentencing outside the prescribed range is unusual. The Commission adopted the departure policy based, in part, on the belief that courts would not invoke it very often. *See* Guidelines, Ch. 1, Pt. A, § 4(b). Departure is permissible only where the Court finds "an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." *See* 18 U.S.C. § 3553(b); *see also* Guidelines, Ch. 1, Pt. A, § 4(b).

 A number of specific factors, including race, sex, national origin, creed, religion, and socio-economic status, may never be considered as "aggravating or mitigating circumstances" warranting a departure. *See* Guidelines, Ch. 1, Pt. A, § 4(b). With those specific exceptions, however, the Commission did not intend to limit the kinds of factors which may constitute grounds for departure in an atypical case. *Id.*

 The present case is atypical in several respects. First, Mr. King's wrongful conduct contributed significantly to provoking the offense behavior. Consequently, though the offense of which defendants Koon and Powell were convicted falls within the language of the Guidelines, Koon's and Powell's underlying conduct falls outside the range of more typical offenses for which the Guidelines were designed.

Second, defendants Koon and Powell have already sustained, and will continue to incur, punishment in addition to the sentence imposed by this Court. The extraordinary notoriety and national media coverage of this

dent of March 3, 1991.

case, coupled with the defendants' status as police officers, make Koon and Powell unusually susceptible to prison abuse. Moreover, Koon and Powell will be subjected to multiple adversarial proceedings and stripped of their positions and tenure by the LAPD.

Third, while the offense of conviction involves a serious assault, there is no evidence, and the government does not argue, that Koon and Powell are dangerous or likely to commit crimes in the future.

Fourth, defendants Koon and Powell were indicted for their respective roles in beating Mr. King only after a state court jury acquitted[12] them of charges based on the same underlying conduct. Under these circumstances, the successive state and federal prosecutions, though legal, raise a specter of unfairness.

Of these four factors, only Mr. King's wrongful conduct independently warrants a sentence reduction. *See* Guideline § 5K2.10. Standing alone, none of the other enumerated factors clearly justifies a departure from the Guidelines. However, the Court's decision whether to depart "require[s] the evaluation of a complex of factors." *Cook*, 938 F.2d at 151. As the Ninth Circuit observed in *Cook*:

> No single factor may be enough to point to the wise course of decision. But a wise person will not look on each particular factor abstractly and alone. Rather, it will be how the particular pieces fit together, converge, and influence each other that will lead to the correct decision.

*See* 938 F.2d at 153. The Court finds that the second, third and fourth factors, taken together, justify a reduced sentence.

Each of the first and second factors, as well as the third and fourth factors in combination, constitute "mitigating circumstances," not adequately considered by the Commission in formulating the Guidelines. *See* Guidelines, Ch. 1, Pt. A, § 4(b); *see also United States v. Cook*, 938 F.2d 149, 151 (9th Cir.1991). Based on these unique circum-

stances, a sentence outside the prescribed Guideline range is appropriate for both defendants Koon and Powell.

### i. *Mr. King's Wrongful Conduct*

■ In reducing Mr. Koon's and Mr. Powell's sentence below the prescribed Guidelines range, the Court finds, and considers as a mitigating circumstance, that Mr. King's wrongful conduct contributed significantly to provoking the offense behavior. *See* Guidelines § 5K2.10; *see also United States v. Yellow Earrings*, 891 F.2d 650, 653–54 (8th Cir.1989) (affirming downward departure from guidelines where victim substantially provoked defendant's assault by pushing her, verbally abusing her, and publicly humiliating her).

The evidence at trial supports a finding that Mr. King engaged in illegal conduct prior to and during his arrest. Mr. King was admittedly intoxicated while driving. He exceeded the speed limit at times. Mr. King failed to stop his vehicle, even after he belatedly perceived the flashing police lights and sirens. Perhaps due to his intoxication, Mr. King was slow to comply with police orders to exit his car. In any event, he failed to remain prone on the ground as the police ordered him to do. Rather, Mr. King resisted Officers Briseno, Solano, Powell, and Wind. He attempted to escape from police custody. In doing so, Mr. King, a still unsearched felony suspect, ran in the direction of Mr. Powell. He intended to escape into the unlit recreation area. At this point, the officers' use of the baton commenced. The initial provocation for the subsequent course of events was Mr. King's wrongful conduct.

Significantly, defendants Koon and Powell, along with the other LAPD, CHP, and School District officers at the scene of Mr. King's arrest, were present only by happenstance. Had Mr. King pulled over, and not caused the CHP officers to pursue him for up to eight miles, Koon, Powell and the other LAPD officers would not have been sum-

---

12. The state of California prosecuted defendant Powell on three counts. He was acquitted on Count I (assault by force likely to produce great bodily injury and with a deadly weapon, Cal.Pen. Code § 245(a)(1)) and Count III (submission of a false police report, Cal.Pen.Code, § 118.1). The jury was divided 8–4 in favor of acquittal on Count II (unnecessarily assaulting or beating any person, Cal.Pen.Code § 149).

moned. Messrs. Koon and Powell did not seek out a victim; rather, their very presence at the scene was a consequence of Mr. King's wrongful conduct.

At 6'3" and approximately 225 lbs., Mr. King was appreciably larger than both Koon and Powell. Mr. King's reputation for violence was unknown to the officers, but he was a felony suspect. Mr. King resisted and evaded arrest, persistently failed to comply with police commands, and had not been searched for weapons. As such, the defendants' early perception of Mr. King as dangerous was reasonable. This initial perception was reinforced when Mr. King rose from a prone position on the ground and attempted to escape, running toward Mr. Powell. Whether or not Mr. King actually presented a danger to either Powell or Koon, their perception of danger was reasonable. At this point on the videotape, the use of force begins, provoked substantially, if not entirely, by Mr. King.

From the time of that first baton blow until 1:07:28, when the defendants' conduct crossed the line to illegality, Mr. King persisted in his failure to obey the police. Defendants Koon and Powell repeatedly ordered Mr. King to assume the felony-prone position to avoid further confrontation [13].

While Mr. King's wrongdoing precipitated the initial, lawful use of force, and thereby substantially contributed to the offense conduct, Mr. King's provocative behavior eventually subsided. The Court recognizes that by the time the defendants' conduct crossed the line to unlawfulness, Mr. King was no longer resisting arrest. He posed no objective threat, and the defendants had no reasonable perception of danger. Nevertheless, the incident would not have escalated to this point, indeed it would not have occurred at all, but for Mr. King's initial misconduct.

Because the defendants were convicted of violation of 18 U.S.C. § 242, Guideline Section 2H4.1 for interference with civil rights under color of law, and Guideline Section 2A2.2 for aggravated assault linguistically ap-

ply. However, Mr. King's wrongdoing and the substantial role it played in bringing about the defendants' unlawful conduct remove this case from the "heartland" of offenses contemplated by the aggravated assault Guideline. *See* Guidelines, Ch. 1, Pt. A., § 4(b).

Messrs. Koon and Powell were convicted of conduct which began as a legal use of force against a resistant suspect and subsequently crossed the line to unlawfulness, all in a matter of seconds, during the course of a dynamic arrest situation. However, the convicted offenses fall under the same Guideline Sections that would apply to a jailor, correctional officer, police officer or other state agent who intentionally used a dangerous weapon to assault an inmate, without legitimate cause to initiate a use of force.

The two situations are clearly different. Police officers are always armed with "dangerous weapons" and may legitimately employ those weapons to administer reasonable force. Where an officer's initial use of force is provoked and lawful, the line between a legal arrest and an unlawful deprivation of civil rights within the aggravated assault Guideline is relatively thin. The stringent aggravated assault Guideline, along with its upward adjustments for use of a deadly weapon and bodily injury, contemplates a range of offenses involving deliberate and unprovoked assaultive conduct. The Guidelines do not adequately account for the differences between such "heartland" offenses and the case at hand.

The criminal conduct of a state officer who launches an unprovoked assault on an individual in custody is dissimilar to the conduct of defendants Koon and Powell who, at least initially, were incited to use force. Consistent with the policy of the Guidelines, the sentence imposed must reflect this disparity. *See* Guidelines Ch. 1, Pt. A, § 3 (Guidelines seek reasonable uniformity in sentencing for similar criminal offenses committed by similar offenders); *see also* 18 U.S.C. § 3553(a)(6) (courts should avoid unwarrant-

---

**13.** Although this portion of the memorandum is devoted to identification of mitigating circumstances, it includes a discussion of the factors set forth in Guidelines Section 5K2.10(a)-(e). These factors are relevant to the extent of the sentence reduction, and the Court has considered them for that purpose.

ed sentence disparities among defendants with similar records who are guilty of similar conduct).

### ii. *Additional Punishment*

■ A legitimate mitigating circumstance arises where a defendant is subject to punishment in addition to the court-imposed sentence. *See United States v. Aguilar*, 994 F.2d 609, 644 (1993). The courts have recognized two categories of "additional punishment" as valid bases for downward departure: (1) the defendant's extreme vulnerability to prison abuse; and (2) the defendant's exposure to additional adversarial proceedings as a result of his conviction. Both categories are applicable to each defendant Koon and Powell.

### (a). *Extreme Vulnerability to Abuse in Prison*

■ Where the severity of any imposed sentence is increased due to the defendant's "extreme vulnerability" to prison abuse, a downward departure may be considered. *See United States v. Gonzalez*, 945 F.2d 525, 526 (2d Cir.1991); *United States v. Lara*, 905 F.2d 599 (2d Cir.1990).

*Lara* involved a prisoner with an immature and fragile appearance and a bisexual orientation, who had been threatened during his presentence incarceration. Prison officials determined that the only way to protect Lara was to place him in solitary confinement. The district court found this extraordinary circumstance increased the severity of Lara's prison term and warranted a downward departure, and the Court of Appeals affirmed. *See Lara*, 905 F.2d at 605.

In *Gonzalez*, the defendant was likewise "extremely small and feminine looking." 945 F.2d at 526. Unlike the defendant in *Lara*, though, Gonzalez was not homosexual or bisexual, nor had he been victimized or threatened prior to sentencing. There was no indication that Gonzalez would be kept in solitary confinement. Notwithstanding, the district court concluded that a downward departure was appropriate to ensure Gonzalez's safety, and the Second Circuit affirmed. *See Gonzalez*, 945 F.2d at 526–27.

■ Obviously, the facts of the present case are significantly different. From a purely physical standpoint, defendants Koon and Powell are not unusually vulnerable to prison abuse. However, the widespread publicity and emotional outrage which have surrounded this case from the outset, in addition to the defendants' status as police officers, lead the Court to find that Koon and Powell are particularly likely to be targets of abuse during their incarceration. While the Commission did consider the vulnerability of prisoners to physical assault in formulating the Guidelines, *see Lara*, 905 F.2d at 603, the circumstances of this case are extraordinary and were not adequately contemplated. *See* 18 U.S.C. § 3553(b); Guidelines § 5K2.0 (courts may depart based on a factor considered in the Guidelines where, due to unusual circumstances, the factor is present to a degree not contemplated by the Guidelines).

The Court would certainly hesitate to grant a departure based solely on Koon's and Powell's vulnerability to abuse. The few cases that support "extreme vulnerability" as a factor for departure are limited to consideration of a defendant's physical characteristics, and are therefore distinguishable. Moreover, while the Second Circuit has expressly upheld a prisoner's extreme vulnerability as a proper ground for departure, the Ninth Circuit has not ruled on the issue. *But see Aguilar*, 994 F.2d at 644 (citing with approval the Second Circuit's holding in *Lara*, 905 F.2d at 601–03, for the proposition that additional punishment is a valid mitigating factor). Finally, as the government notes, many police officers are now, and have been, safely incarcerated in the federal prison system. *See* Government's Consolidated Positions and Objections, at p. 14 & Ex. G.

However, the Court considers the defendants' vulnerability to prison abuse, not by itself, but in combination with other factors, including another source of additional punishment recognized by the Ninth Circuit: multiple adversarial proceedings. *Cook*, 938 F.2d at 151. As such, the unusual likelihood that Koon and Powell will be fearful of or actually subjected to physical harm while incarcerated, and the resultant increased severity of

any sentence imposed, are legitimate factors in the Court's decision to depart downward.

#### (b). *Additional Adversarial Proceedings*

 In *Aguilar*, the Ninth Circuit recognized that defendants may incur "additional punishment" warranting a downward departure where, as a result of their conviction, they are subjected to further public, quasi-judicial proceedings and the burdensome consequences that flow therefrom[14]. *See Aguilar*, 994 F.2d at 644 (affirming district court's downward departure on ground that convicted federal judge would be subject to a long course of adversarial proceedings and resultant humiliation and economic burden).

Defendants Koon and Powell will be subjected to a multiplicity of adversarial proceedings. The LAPD Board of Rights will charge Koon and Powell with a felony conviction[15] and, in a quasi-judicial proceeding, will strip them of their positions and tenure[16]. Koon and Powell will be disqualified from other law enforcement careers. In combination, the additional proceedings, the loss of employment[17] and tenure, prospective disqualification from the field of law enforcement, and the anguish and disgrace these deprivations entail, will constitute substantial punishment in addition to any court-imposed sentence. In short, because Koon and Powell are police officers, certain unique burdens flow from their convictions[18].

Additional punishment will be visited upon defendants Koon and Powell as a result of their vulnerability to prison abuse and the adversarial proceedings and related consequences they will suffer as police officers. Such additional punishment constitutes a mitigating circumstance not adequately considered by the Guidelines.

#### iii. *Absence of Need to Protect the Public*

 In determining the sentence to be imposed, the Court must consider both the need to reflect the seriousness of the offense, and the need to afford adequate deterrence to criminal conduct. *See* 18 U.S.C. § 3553. In this case, defendants Koon and Powell abused their positions of public trust. The offenses of which they were convicted are serious[19], and the Guidelines emphasize the "compelling public interest in deterring and adequately punishing" such conduct. *See* Guidelines § 2H1.4 Commentary, Background.

14. The Ninth Circuit considered the additional disbarment and impeachment proceedings that Judge Aguilar would endure not as an independent basis for departure, but in combination with the unique burdens that those proceedings imposed. *Aguilar*, 994 F.2d at 644 (citing *Cook*, 938 F.2d 149, 153 (9th Cir.1992)). This Court likewise considers a combination of factors in determining that Koon and Powell face "additional punishment." Those factors include the other adversarial proceedings to which Koon and Powell will be subjected and the associated burdens, together with the defendants' vulnerability to prison abuse.

15. At the sentencing hearing, defense counsel represented that both Koon and Powell also face Board of Rights proceedings on charges of their misconduct on March 3, 1991.

16. As defense counsel observes, Koon and Powell have already endured multiple adversarial proceedings, as they were prosecuted twice, in successive state and federal trials, for the same underlying conduct. The burden these successive trials imposed on Koon and Powell, while undoubtedly substantial, did not flow from their criminal convictions, and is therefore not the sort of "additional punishment" contemplated in *Aguilar*.

17. The plurality and the dissent in *Aguilar* apparently agree that loss of position, by itself, would not justify a departure. *See* 994 F.2d at 624–25 & 645.

18. The specific factors warranting departure in *Aguilar* were, of course, peculiar to Judge Aguilar's circumstance. The Ninth Circuit considered the additional punishment Judge Aguilar would suffer because he is a federal judge, i.e., disbarment and impeachment hearings, removal from a life-tenured position, disqualification from future government appointive positions, and potential forfeiture of his pension rights. *See Aguilar*, 994 F.2d at 644. Presumably, the Ninth Circuit did not intend to create a downward departure available exclusively to convicted Article III judges. The factors considered in the present case, while not identical to those warranting departure in *Aguilar*, are certainly analogous.

19. Indeed, the Guidelines are explicit that "persons who abuse their positions of trust ... are generally viewed as more culpable." *See* Guidelines § 3B1.3 Commentary, Background.

However, the sentence imposed must also take into account the need to protect the public from further criminal activity by defendants Koon and Powell. *See* 18 U.S.C. § 3553(a)(2)(C). The Court finds, and the government does not dispute, that neither Koon nor Powell are violent, dangerous, or likely to engage in future criminal conduct. There is no reason to impose a sentence that reflects a need to protect the public from these defendants.

Given the seriousness of the offense conduct here, the absence of a potential for recidivism does not, by itself, warrant a departure [20]. However, in attempting to fashion a fair and appropriate sentence for Koon and Powell, the Court has considered, among other factors, that their incarceration is not necessary to protect the public.

### iv. *Successive State and Federal Prosecutions*

 In the California state court case, *People v. Powell, et al.*, Messrs. Koon and Powell were tried by a jury and acquitted [21] of criminal charges for their respective roles in the March 3, 1991 beating of Mr. King. The same underlying conduct gives rise to the convictions on which the Court must now sentence Koon and Powell. As the Court has repeatedly stated, both in its pretrial orders and on the record at trial, the federal prosecution of Messrs. Koon, Powell, Wind and Briseno did not place those defendants in double jeopardy. Under the doctrine of "dual sovereignty," the state and federal governments are free to prosecute violations of their respective laws. *See Heath v. Alabama*, 474 U.S. 82, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985). Successive state and federal prosecutions for the same act do not violate the Fifth Amendment.

 Nevertheless, a federal conviction following a state acquittal based on the same underlying conduct does create an unusual circumstance, and significantly burdens the defendants. The state of California vigorously prosecuted Koon and Powell, and lost. Many disagreed with the outcome, but there has been no showing that a clear miscarriage of justice occurred. While the federal government has certainly not transgressed the defendants' constitutional rights, its indictment of Koon and Powell after verdicts of acquittal by a state court jury raises a specter of unfairness.

In sum, the Court finds that the combined extraordinary circumstances of this case give rise to "mitigating circumstances" that warrant a departure from the Guidelines range. In reaching this conclusion, the Court is mindful that, by creating the Sentencing Commission and adopting the Guidelines, Congress sought to achieve uniformity in sentencing and intended that departures would be rare. On the other hand, it was not Congress' aim to straitjacket the sentencing court. *See Lara*, 905 F.2d at 604. The legislative history is explicit on this point, stating that:

> [t]he Committee does not intend that the guidelines be imposed in a mechanistic fashion. It believes that the sentencing judge has an obligation to consider all the relevant factors in a case and to impose a sentence outside the guidelines in an appropriate case. The purpose of the sentencing guidelines is to provide a structure for evaluating the fairness and appropriateness of the sentence for an individual offender, not to eliminate the thoughtful imposition of individualized sentences.

*See Lara*, 905 F.2d at 604 (citing S.Rep. No. 225, 98th Cong.2d Sess. 52, reprinted in 1984

---

**20.** Additionally, the Guidelines take into account the need for public protection, at least to some extent, by factoring a defendant's criminal history into the determination of an appropriate sentence range. *See* Guidelines, Ch. 5, Pt. A. However, Koon and Powell fall into the lowest criminal history category, along with first-time offenders who may manifest a violent nature or a potential for recidivism. Within Criminal History Category I, the Guidelines do not adequately distinguish defendants who, for a variety of reasons, are particularly unlikely to commit crimes in the future. Here, the need to protect the public from the defendants' future criminal conduct is absent "to a degree" not contemplated by the Guidelines. *See* 18 U.S.C. § 3553(b); Guidelines § 5K2.0.

**21.** As noted earlier, Powell was acquitted on two of three Counts. The jury was divided as to Count II against Powell.

U.S.Code Cong. & Admin.News 3182, 3235 (Legislative History)).

The Court's decision to depart from the Guidelines in this case is the result of a considered effort to assess the unusual circumstances of the underlying conduct, with the aim of fashioning fair and appropriate sentences for Mr. Koon and Mr. Powell as individuals.

### v. *Extent of the Departure*

■ The Court finds that the convergence of extraordinary factors in this case warrants a downward departure of 8 levels, resulting in a final offense level of 19. The downward departure is appropriate for each defendant, Koon and Powell.

The Court does not have limitless discretion in determining an appropriate departure, but is guided by the judgments of Congress and the Sentencing Commission. *United States v. Lira–Barraza,* 941 F.2d 745, 748 (9th Cir.1991). Where it finds a departure from the prescribed Guidelines range is warranted, the Court must provide a reasoned, detailed explanation of the extent of its departure. *See* 18 U.S.C. § 3553(c)(2); *Lira–Barraza,* 941 F.2d at 748. The explanation must be "founded on the structure, standards and policies of the Act and Guidelines." *Id.* at 751.

■ In determining the sentence to be imposed, the Court must not create unwarranted disparities among defendants with similar records who are guilty of similar conduct. *See* 18 U.S.C. § 3553(a)(6). Defendants Koon and Powell are sentenced under the Guideline sections applicable to all government officers who abuse their positions of trust by assaulting, or permitting to be assaulted, an individual in official custody, in violation of that individuals' constitutional rights. The conduct of Koon and Powell is dissimilar to the conduct of others who might be sentenced under the same Guideline sections, in that King's wrongful conduct substantially contributed to provoking the offense behavior. Based on this distinction,

expressly recognized by the Guidelines as a proper basis for departure, the Court reduces the defendants' total offense level by 5 points.

In determining that a 5–level reduction is appropriate, the Court has relied on the factors set forth at Guidelines Section 5K2.10 [22], the overall standards and policies of the Guidelines, and its own discretion in attempting to fashion a fair sentence. The policy of the Guidelines expressly contemplates a downward departure where a victim's wrongful conduct removes the offense from the heartland of typical cases, *see* Guidelines Ch. 1, Pt. A, § 4(b) and § 5K2.10, but the appropriate extent of departure is left to the Court's discretion, *see* Guidelines § 5K2.0 and Ch. 1, Pt. A, § 4(b) (departures based on the factors listed in Chapter 5, Part K remain unguided). Nevertheless, *Lira–Barraza* instructs the Court to consider the structure, as well as the policy of the Guidelines, in deciding how far to depart. 941 F.2d at 751.

As a preliminary matter, the Court observes that *Lira–Barraza* and its progeny place the district courts in an untenable position, by requiring on one hand that a departure be based on factors not adequately considered by the Guidelines, and on the other hand that the Court find some analogy in the Guidelines to justify the extent of departure. In any event, the Court has attempted to follow *Lira–Barraza*'s directive, and has reviewed the Guidelines for an analogy which might offer some guidance.

No helpful analogy was found, since no Guideline section provides a downward adjustment based on a victim's wrongful conduct that contributes to the offense, or any similar factor. In fact, very few Guideline sections provide for downward adjustments at all. Rather, the Guidelines generally specify floor offense levels, which are adjusted upward based on specific offense characteristics. Given the wide range of factors requiring upward adjustments, the extent of an upward departure may be more readily explained by analogy to the Guidelines. The

---

**22.** The relevant § 5K2.10 factors and their application to this case are discussed earlier, in ex- plaining the grounds for departure.

few Guidelines sections that set forth specific grounds for downward adjustment are inapposite to this case[23].

Based on a convergence of three additional factors, the Court finds another mitigating circumstance which warrants a 3-level departure. The first factor in the convergence is the "additional punishment" to which defendants Koon and Powell will be subjected. The clear policy of the Guidelines is that similar defendants convicted of similar offenses should receive like sentences. Because the additional punishment resulting from the defendants' vulnerability to prison abuse, exposure to multiple adversarial proceedings, and status as police officers will increase the severity of any sentence imposed, the Court may reduce the sentence to account for these factors without creating an unwarranted disparity.

The absence of a need to protect the public from these defendants, together with the unusual circumstance of their indictment after the state court verdicts are the second and third factors in the convergence. These factors distinguish Koon and Powell from other defendants who might be convicted of similar conduct. Their sentence should reflect the distinction. In its discretion, the Court finds this complex of three factors justifies a 3-level departure[24].

Thus, the final offense level for each defendant after downward departure is 19. An offense level of 19 with a Criminal History Category I results in a prescribed Guideline sentencing range of 30 to 37 months. *See* Guidelines, Ch. 5, Pt. A.

### E. *Appropriate Sentence Within Guideline Range*

Having departed downward to offense level 19, the Court sentences defendants Koon and Powell at the low end of the prescribed Guideline range to a term of 30 months. In reaching this decision, the Court has considered the Pre-Sentence Reports and numerous letters written on behalf of both defendants Koon and Powell. Based on their strong family and community ties and distinguished records of public service, the Court sentences each defendants at the low end of the prescribed Guidelines range to a term of 30 months.

### F. *Supervised Release*

■ Pursuant to Guidelines Section 5D1.1, the Court must order a term of supervised release when a sentence of imprisonment of more than one year is imposed, or when required by statute. *See* Guidelines § 5D1.1(a).

Defendants Koon and Powell were convicted of violation of 18 U.S.C. § 242 resulting in bodily injury, a Class C felony. *See* 118 U.S.C. § 3559. Since Section 242 does not specifically require a term of supervised release, the length of the term is governed by Guidelines Section 5D1.2(b). Conviction of a Class C felony results in a supervised release term of at least two years but not more than three years. *See* Guidelines § 5D1.2(b)(2).

---

23. For example, the Guidelines provide a downward adjustment for certain crimes if the offense was committed other than for profit. *See, e.g.,* Guidelines Section § 2L2.3 (Trafficking in a United States Passport); § 2L1.1 (Smuggling and Transporting, or Harboring an Unlawful Alien). Similarly, under the guideline applicable to transportation for the purpose of prostitution, the Commission recommends an 8-level downward departure if the offense was not committed for profit and did not involve physical force or coercion. *Id.* § 2G1.1, Commentary, Application Note 1. Under the guideline for threatening communications, a 4-level downward adjustment applies where the defendant's conduct involved a specific instance evidencing little or no deliberation. A defendant who is an accessory after the fact is assigned an offense level 6 points lower than the underlying offense level. *Id.* § 2X3.1(a). None of these Guideline Sections or grounds for downward adjustment is analogous to the present case.

24. As before, the Court is unable to articulate an analogy to the "structure" of the Guidelines, and has instead relied on the policies expressed therein. The Commission intended that a departure based on "additional punishment" or any other factor not mentioned in the Guidelines would remain unguided and left to the courts' discretion. *See* Guidelines Ch. 1, Pt. A, § 4(b). The requirement that departures be guided by analogy to other guidelines provisions seeks to ensure that the objectives of uniformity and proportionality are served. *See United States v. Streit,* 962 F.2d 894, 902 (1992). The Court has been mindful of those objectives in determining the extent of departure.

The Probation Officer recommends a term of two years. Also, the Court has considered the factors set forth at 18 U.S.C. §§ 3553(a) & 3583(c), and finds that two years supervised release is reasonable and appropriate for both defendants Koon and Powell.

### G. Restitution, Fines, and Costs of Confinement

#### i. Restitution

 The Court, when sentencing a defendant convicted of an offense under Title 18, may order in addition to any other penalty authorized by law that the defendant make restitution to any victim of the offense. 18 U.S.C. § 3663(a)(1). If a defendant is sentenced to a term of supervised release, then any restitution ordered shall be a condition of such supervised release. 18 U.S.C. § 3663(g).

 In determining whether to impose an order of restitution, the Court must consider the amount of loss sustained by the victim as a result of the offense, the financial resources of the defendant, the financial needs and earning ability of the defendant and his dependents, and such other factors as it deems appropriate. 18 U.S.C. § 3664(a). The Court's authority to deny restitution is limited. *See* Guidelines § 5E1.1, Commentary. If the Court does not order restitution, it must state its reason for doing so. 18 U.S.C. § 3553(c); *see also* Guidelines § 5E1.1, Commentary.

 Restitution is claimed in the amount of $189,494.31 for both Mr. Koon and Mr. Powell. *See* Koon Pre–Sentence Report, para. 114; Powell Pre–Sentence Report, para. 134. Said claim is unsubstantiated and is best left for the pending civil action. Moreover, neither defendant is able, or is likely to become able to pay restitution. *See* Koon Pre–Sentence Report, paras. 119–22, 132; Powell Pre–Sentence Report, paras. 100–02, 112. An order to pay restitution would place an undue burden on Mr. Koon's dependents. For these reasons, restitution will not be ordered.

#### ii. Fines

 Under the Guidelines, the Court is required to impose a fine in all cases, except where the defendant establishes that he is unable to pay and is unlikely to become able to pay any fine. *See* Guidelines § 5E1.2. The Fine Table at Guidelines Section 5E1.2(c)(3) indicates the range of sanctions corresponding to the defendant's offense level. In addition to the fine imposed pursuant to Section 5E1.2(c), the Court must impose an additional fine at least sufficient to pay the costs to the government of any imprisonment, probation, or supervised release ordered. *See* Guidelines § 5E1.2(i).

 However, the Court may impose a lesser fine or waive all fines, including costs of confinement, where the defendant establishes (i) that he is not able to pay and, even with the use of a reasonable installment schedule, is not likely to become able to pay all or part of the fine; or (ii) that imposition of a fine would unduly burden the defendant's dependents. *See* Guidelines § 5E1.2(f) & (i).

 The Pre–Sentence Report indicates that Koon's assets are essentially exhausted. He has five dependent children who will be unduly burdened if a fine is imposed. Powell is likewise unable to pay a fine, and unlikely to become able to pay. Accordingly, all fines are waived, including the cost of imprisonment and supervision.

#### iii. Victims of Crime Act of 1984

 Pursuant to the Victims of Crime Act of 1984, the Court must impose a special assessment of $50 on any individual convicted of a felony against the United States. *See* Guidelines § 5E1.3. The Act does not authorize the court to waive imposition of the assessment. *See* Guidelines § 5E1.3, Commentary. Each defendant is therefore ordered to pay a $50 special assessment.

The Clerk is ordered to prepare judgment and commitment orders consistent with the Court's findings and orders expressed here-

in, and with such other orders the Court may articulate during the sentencing hearing.

IT IS SO ORDERED.